United States Court of Appeals
FOR THE EIGHTH CIRCUIT
No. 96-3013

United States of America,     *
    *
       Appellee,     *
    *    Appeal from the United States
    *    District Court for the
       v.     *    District of Minnesota.
    *
Donovan Walter Horsman,     *
    *
       Appellant.     *

_____

Submitted: February 11, 1997
Filed: June 13, 1997

_____

Before MAGILL,[1] BEAM, and LOKEN, Circuit Judges.

_____

MAGILL, Circuit Judge.

      Donovan Walter Horsman was convicted in the district court[2] of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (1994), and was sentenced to the statutory mandatory minimum of 180 months imprisonment. On appeal, Horsman argues that: (1) section 922(g) is unconstitutional; (2) a juror Horsman

___

[1]The Honorable Frank J. Magill was an active judge at the time this case was submitted and assumed senior status on April 1, 1997, before the opinion was filed.

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

struck with a peremptory challenge should have been struck for cause; (3) government witnesses' testimony regarding a firearm trace report was inadmissible hearsay; and (4) the district court erred in allowing the government to present evidence regarding the specific nature of Horsman's prior convictions. We affirm.

## I.

Horsman was first convicted of burglary in Minnesota in April 1983, when he was eighteen years old. By the time he was thirty, Horsman had been convicted of a total of four felonies in Minnesota. During mid-October of 1994, while Horsman was on supervised release from incarceration for his fourth felony conviction, Horsman allegedly violated the terms of his release by forging a traveler's check. A warrant was issued for his arrest.

During mid-October of 1994, Horsman was staying with his girlfriend, Andrea Glass, in the Mounds View, Minnesota apartment that she shared with her cousin, Nick Marjanovich. On the morning of October 18, 1994, Glass discovered that both Horsman and her car were missing. Also missing from the apartment was a box of .38 special ammunition and a Smith & Wesson .357 magnum handgun belonging to Marjanovich.

Glass immediately contacted the Mounds View police and reported that her car was missing. Glass provided a description of Horsman to the police, and subsequently informed them when Horsman returned her car. Officer Roger Koopmeiners and Lieutenant David Brick of the Mounds View Police Department located Horsman walking in a wooded area near Glass's apartment. The police officers apprehended Horsman and discovered a loaded Smith & Wesson .357 magnum handgun in Horsman's waistband. The police also discovered 24 rounds of .38 special ammunition in Horsman's pocket and a box of .38 special ammunition in a duffle bag Horsman was carrying. In all, Horsman was carrying 54 rounds of ammunition.

On November 22, 1994, while Horsman was in Minnesota state custody for his probation violation, Horsman was interviewed by Special Agent Catherine Kaminski of the Bureau of Alcohol, Tobacco, and Firearms (BATF). After being Mirandized, Horsman stated to Special Agent Kaminski, "'I got arrested. I had a gun. What more can I say?'" Trial Tr. at 276 (testimony of Special Agent Kaminski).

Horsman was indicted on the federal charge of being a felon in possession of a firearm and proceeded to trial in the United States District Court for the District of Minnesota. Before trial, Horsman moved in limine that evidence of his prior convictions should be excluded from trial. The district court granted this motion in part and denied the motion in part, allowing the government to present the name, date, and place of Horsman's four prior felony convictions. Other information was redacted, however, and the phrase "violent felonies" was redacted from the indictment.

During voir dire, the district court refused to strike venireperson Rodney Beck for cause, although Beck had explained that his brother-in-law had been shot to death by a car-jacker. Beck believed that the murderer had received too light a sentence for the murder, and that law should "go after" criminals who use guns, rather than guns themselves. See Trial Tr. at 126. Horsman used a peremptory strike to remove Beck from the panel.

To convict Horsman of being a felon in possession of a firearm, the government had the burden of proving, beyond a reasonable doubt, that: (1) Horsman had previously been convicted of a crime that was punishable by a term of imprisonment exceeding one year;[3] (2) Horsman knowingly possessed a firearm; and (3) the firearm has been in or has affected interstate commerce. See 18 U.S.C. § 922(g)(1); United

---

[3]Pursuant to 18 U.S.C. § 921(a)(20) (1994), a "crime punishable by imprisonment for a term exceeding one year" does not include certain misdemeanors and certain business crimes.

States v. Wilson, 107 F.3d 774, 779 (10th Cir. 1997); United States v. Johnson, 18 F.3d 641, 649 & n.18 (8th Cir. 1994). At trial, the government presented evidence that Horsman had been convicted of the felony of burglary on three occasions and the felony of aggravated robbery once, all of which were punishable by more than one year imprisonment. See Trial Tr. at 213-16 (testimony of Anoka County Probation and Parole Officer Robert Knickerbocker). This evidence of Horsman's prior convictions was summarized during opening and closing statements by the prosecution, see id. at 181-82 (prosecution opening statements); 388 (prosecution closing statements), and was also described in the indictment. See Clerk's R. at 165. The government also presented testimony from Officers Koopmeiners and Brick that Horsman had possessed the Smith & Wesson .357 magnum handgun on October 18, 1994, see Trial Tr. at 233 (testimony of Officer Koopmeiners); 250 (testimony of Officer Brick), as well as Special Agent Kaminski's description of Horsman's confession. Id. at 276.

To prove the interstate commerce element of the offense, Special Agent Joseph Cludy of the BATF, an expert in the origin of firearms, testified that the Smith & Wesson .357 magnum handgun recovered from Horsman, which was a model 19-3 with serial number 9K90226, had "Made in U.S.A." and "Springfield, Massachusetts" inscribed on it. See id. at 258 (testimony of Special Agent Cludy). Based on research and his expertise, Special Agent Cludy testified that the handgun had been manufactured in Springfield, Massachusetts, and that it had crossed a state line. Id. at 258-59.

On cross-examination, Special Agent Cludy was asked by defense counsel if he had obtained a trace report on the .357 magnum handgun from Smith & Wesson, and Special Agent Cludy testified that he had not. See id. at 262. Defense counsel also questioned whether the weapon could have been manufactured in Minnesota under license from Smith & Wesson, and Special Agent Cludy testified that he was not aware of any licensing agreements between Smith & Wesson and any other manufacturer. Id. at 263-64. Finally, Special Agent Cludy was asked if he was aware "that guns can be

counterfeited?" Trial Tr. at 265 (question by defense counsel). Special Agent Cludy responded, "I've heard of such a thing, but very rarely." Id.[4]

On redirect examination, and over Horsman's objection, Special Agent Cludy testified that he had been informed by Special Agent Kaminski that Special Agent Kaminski had completed a trace report on the .357 magnum handgun. See id. at 266. On further redirect examination, Special Agent Cludy described the BATF's tracing procedure. See id. at 270-71.

Special Agent Kaminski testified that she had completed a tracing report and had learned that the .357 magnum handgun possessed by Horsman on October 18, 1994, was owned by Marjanovich. See Trial Tr. at 280. Over Horsman's objection, Kaminski testified that the Smith & Wesson .357 magnum handgun, which had been traced back to Springfield, Massachusetts, had been sold by a firearms dealer in Grand Rapids, Minnesota, to Marjanovich's mother, Georgia Marjanovich. Id. at 284.

---

[4]Defense counsel continued:

Question: Smith & Wesson is a well-known brand of gun. Correct?

Answer by Special Agent Cludy: Correct.

Q. And someone producing a lower quality gun could get more money if it was made to look like a Smith & Wesson gun. Correct?

A. In theory, yes, sir.

Defense counsel: I have nothing further.

Trial Tr. at 265.

Following the two-day trial, the jury convicted Horsman of being a felon in possession of a handgun. Despite Horsman's plea of not guilty and over the government's objection, the district court granted Horsman a two-point reduction in Horsman's sentencing level for Horsman's acceptance of responsibility.[5] Horsman was then sentenced to the statutory mandatory minimum sentence of 180 months imprisonment. Horsman now appeals his conviction.

## II.

Most of Horsman's arguments on appeal are forestalled by on-point and contrary Eighth Circuit precedent. This Court has specifically held that § 922(g) is a constitutional exercise of Congress's Commerce Clause authority. See United States v. Bates, 77 F.3d 1101, 1104 (8th Cir.), cert. denied, 117 S. Ct. 215 (1996). We are bound by this prior determination by a panel of this Court. See United States v. Wright, 22 F.3d 787, 788 (8th Cir. 1994).

We also reject Horsman's argument that the district court's failure to strike venireperson Beck for cause is grounds for reversal. Even assuming that the district court erred in failing to strike venireperson Beck for cause, Beck did not ultimately serve on the jury panel. Horsman's only complaint is that he had to use a peremptory challenge against Beck, which meant that Horsman did not have an extra peremptory challenge to strike another juror. This does not state a ground for reversal. Rather, for this Court to reverse the district court, Horsman has the burden of showing that the jury which did sit was biased. See United States v. Cruz, 993 F.2d 164, 168-69 (8th Cir. 1993) (citing Ross v. Oklahoma, 487 U.S. 81, 86 (1988)). Horsman has not even attempted to make this showing.

---

[5]The government does not appeal this sentencing decision.

We must also reject Horsman's argument that Special Agent Cludy's testimony regarding the BATF firearm trace report on redirect examination was inadmissible hearsay, and that its admission requires reversal. The government elicited Special Agent Cludy's testimony that Special Agent Kaminski completed a trace report on the Smith & Wesson .357 magnum handgun only after defense counsel elicited testimony that Special Agent Cludy had not completed such a trace report. Had the government not elicited this testimony, the jury might well have been left with the mistaken impression that the government's expert had not taken all reasonable steps in ascertaining the origin of the firearm. In this context, it appears that the government elicited this testimony from Special Agent Cludy not to prove that Special Agent Kaminski's trace report was accurate, but rather to explain why Special Agent Cludy did not complete a trace report himself. Accordingly, this testimony was not hearsay. See Fed. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); see also United States v. Balfany, 965 F.2d 575, 583 n.4 (8th Cir. 1992) ("[The declarant's] statement about the death threat arguably was not offered at trial to prove that [the defendant] actually had made the threat, but instead to show the affect on the hearer, [the testifying witness]--admissible evidence if relevant." (citing Fed. R. Evid. 801(c)).

Horsman also argues that Special Agent Kaminski's testimony regarding the BATF trace report was inadmissible hearsay. The government concedes that Special Agent Kaminski's testimony that Georgia Marjanovich purchased the Smith & Wesson .357 magnum handgun from a dealer in Grand Rapids, Minnesota, which was based on the trace report, was hearsay. See Appellee's Br. at 15. In light of the government's concession, we shall assume that Special Agent Kaminski's testimony was inadmissible hearsay. But see United States v. Maddix, 96 F.3d 311, 315 (8th Cir. 1996) ("The special agent testified as a firearms expert and used the tracing report, which was not itself admitted into evidence, to refresh his recollection. . . . [T]he special agent testified that firearms experts customarily rely upon tracing reports to determine whether

firearms have been transported across state lines. Fed. R. Evid. 703 (facts or data need not be admissible in evidence if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject)." (parenthetical in original) (emphasis added)).

In light of the overwhelming evidence that the Smith & Wesson .357 magnum handgun possessed by Horsman had been manufactured in Massachusetts and had crossed state lines to Minnesota, however, we conclude that any error in admitting Special Agent Kaminski's testimony was harmless. See United States v. Mitchell, 31 F.3d 628, 632 (8th Cir. 1994) ("An evidentiary error amounts to harmless error if, after viewing the entire record, the reviewing court determines that no substantial rights of the defendant were affected, and that the error had no, or only slight, influence on the verdict."). To prove that the firearm Horsman had possessed had been in or had affected interstate commerce, the government only had to prove that "there exists the minimal nexus that the firearm[ has] been, at some time, in interstate commerce." Bates, 77 F.3d at 1104 (quotations and citations omitted). In this case, the government proved this beyond a reasonable doubt both through expert testimony and through the firearm itself, which had its place of manufacture--"Springfield, Massachusetts"--clearly inscribed on it. Cf. Maddix, 96 F.3d at 315-16 (Noting that an expert witness's testimony that a firearm had been transported in interstate commerce was based, in part, on "the identity of the manufacturer (Clerke Technicorp) and the place of manufacture (Santa Monica, California), both of which were stamped on the revolver . . . , and the fact that the revolver had been seized in Missouri.").[6]

---

[6]To counter this compelling evidence of an interstate nexus, at trial Horsman merely suggested, with no evidence whatsoever, that the Smith & Wesson model 19-3 .357 magnum revolver, serial number 9K90226, was a counterfeit that had been manufactured in Minnesota. Contrary to Horsman's apparent belief, the government has no duty to prove that counterfeit Smith & Wesson handguns are not being manufactured in Minnesota. See United States v. Clawson, 831 F.2d 909, 913 (9th Cir. 1987) ("The government has no duty to prove that counterfeit Mauser pistols are not

We do not believe that Special Agent Kaminski's testimony regarding the trace report, nor her explanation that the firearm Horsman possessed in Mounds View, Minnesota--which Horsman conceded he took from Nick Marjanovich's gun cabinet, see Trial Tr. at 317--had been purchased by Georgia Marjanovich in Grand Rapids, Minnesota, could have had more than a slight impact on the jury's decision to convict. Accordingly, any error in admitting this evidence constitutes harmless error.

## III.

At the time the district court denied in part Horsman's motion in limine to exclude evidence of the nature of Horsman's prior convictions, controlling Eighth Circuit precedent allowed the government to present such evidence to prove an element of the offense of a § 922(g) violation. See, e.g., Rush v. United States, 795 F.2d 638, 639 (8th Cir. 1986). The United States Supreme Court has recently held, contrary to this Court's precedent, that the government must accept a § 922(g) defendant's stipulation that he is a felon, and may not put on possibly prejudicial evidence of prior felonies. See Old Chief v. United States, 117 S. Ct. 644, 647 (1997). The Old Chief Court explained:

> Given the[] peculiarities of the element of felony-convict status and of admissions and the like when used to prove it, there is no cognizable difference between the evidentiary significance of an admission and of the legitimately probative component of the official record the prosecution would prefer to place in evidence. For purposes of the [Federal Rule of Evidence] 403 weighing of the probative against the prejudicial, the functions of the competing evidence are distinguishable only by the risk inherent in the one and wholly absent from the other. In this case, as in any other in which the prior conviction is for an offense likely to support conviction on some improper ground, the only reasonable conclusion was that the risk of unfair prejudice did substantially outweigh the discounted

being manufactured in Oregon.").

probative value of the record of conviction, and it was an abuse of discretion to admit the record when an admission was available.

Id. at 655.

In the instant case, Horsman not only offered to stipulate that he was a previously-convicted felon, see Trial Tr. at 164 ("I would certainly be prepared to stipulate that my client has a felony conviction[]") (statement of defense counsel during pretrial motion), but did in fact stipulate to this before the jury. See id. at 187 ("Usually, the government would have to prove to you that Mr. Horsman was convicted of a felony as part of its case. They don't have to do it here, because Mr. Horsman admits it.") (opening statement of defense counsel). Despite this stipulation, the government elicited testimony from Horsman's probation officer regarding the nature of Horsman's four prior felony convictions, and the government repeatedly stated the nature of Horsman's four felony convictions. In light of Old Chief, therefore, the district court abused its discretion in denying Horsman's motion in limine.[7]

That the district court abused its discretion in admitting this evidence does not, however, end our analysis. The Old Chief Court also stated that, "[i]n remanding, we imply no opinion on the possibility of harmless error, an issue not passed upon below." 117 S. Ct. at 656 n.11. This Court has applied the Federal Rule of Criminal Procedure 52(a) harmless error analysis to a district court's erroneous admission of evidence of

---

[7]For the sake of this analysis, we assume that Horsman would have declined to testify on his own behalf at trial if the district court had granted his motion in limine. If Horsman would have testified despite the district court's grant of Horsman's motion in limine, the evidence of Horsman's prior convictions for burglary could have been properly introduced to impeach his testimony. See United States v. Brown, 956 F.2d 782, 787 (8th Cir. 1992) (defendant's prior burglary conviction properly admitted to impeach defendant's testimony); see also. Fed. R. Evid. 609(a)(2) ("[E]vidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment . . . .").

a § 922(g) defendant's prior convictions.  See United States v. Blake, 107 F.3d 651, 653 (8th Cir. 1997); cf. Redding v. United States, 105 F.3d 1254, 1255 (8th Cir. 1997) (per curiam) (reviewing habeas petitioner's argument that court of conviction erred in admitting evidence of § 922(g) defendant's prior convictions for harmless error).

Federal Rule of Criminal Procedure 52(a) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed. R. Crim. P. 52(a).     In United States v. Mechanik, 475 U.S. 66 (1986), the Supreme Court explained the rationale for this rule:

> Federal Rule of Criminal Procedure 52(a) provides that errors not affecting substantial rights shall be disregarded. . . .The reversal of a conviction entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already once taken place; victims may be asked to relive their disturbing experiences.  The passage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible.  Thus, while reversal may, in theory, entitle the defendant only to retrial, in practice it may reward the accused with complete freedom from prosecution, and thereby cost society the right to punish admitted offenders.  Even if a defendant is convicted in a second trial, the intervening delay may compromise society's interest in the prompt administration of justice, and impede accomplishment of the objectives of deterrence and rehabilitation.  These societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence.  But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial.

Id. at 71-72 (quotations, citations, and alterations omitted).  Therefore, under Rule 52(a), "only if the jury may have been substantially swayed by improperly admitted

-11-

evidence must we reverse [a defendant's] conviction." Blake, 107 F.3d at 653 (quotations, citations, and original alteration omitted).

In this case, as Horsman himself admitted, the evidence of Horsman's guilt was overwhelming. See Trial Tr. at 38 ("The facts of this case are so simple and so compelling that the government could prove its case in, I would say two or three hours.") (statement of defense counsel during pretrial motion); see also id. at 30 ("This is not a complex case. It's basically a fender bender: I was stopped at the red light. The car hit me from behind. That's what [this] case amounts to. The cops stopped Mr. Horsman. They found a gun. He then confessed.") (statement of defense counsel during pretrial motion). Of the three elements of the crime of being a felon in possession, the first two are not in contest. Horsman stipulated that he is a felon, see Trial Tr. at 187, and both Horsman's confession and the undisputed testimony of two police officers proved that Horsman possessed a Smith & Wesson .357 magnum handgun on October 18, 1994.

As we have explained above, the third element of Horsman's offense--that the firearm he possessed has been in or has affected interstate commerce--was also proven beyond a reasonable doubt with overwhelming evidence. Horsman's sole challenge to this evidence--evidence which included the firearm itself, with its place of manufacture inscribed upon it--was to suggest, without any evidentiary support, that the Smith & Wesson revolver could have been a counterfeit. We conclude that any reasonable jury would reject such an unsubstantiated attack on the obvious.

Upon analysis, therefore, it is apparent that, in the circumstances of this case, upon retrial of the charge of being a felon in possession of a firearm against Horsman, a reasonable jury would again return a verdict of guilty. At oral argument before this Court, however, Horsman's appellate counsel expressed his hope that the government would decline to retry Horsman for the felon in possession charge. See Tape of Oral Argument (Feb. 11, 1997) ("[F]rom a purely practically point of view, obviously, it

wasn't my desire to go to trial on those facts the first time, and I would hope, again, the second time that we would be successful in negotiating some sort of a plea and I would consider it very unlikely that there would be a second trial. . . . [T]here are other charges available that would not trigger the fifteen year mandatory minimum [sentence].") (statement of appellate counsel). With respect, we do not believe that a defendant's mere hope that the government will wish to plea-bargain a case rather than endure the expense of retrial is sufficient to find that a harmless error was in fact prejudicial.

It is possible that, if Horsman did receive a retrial, that a jury would not be rational and, despite overwhelming evidence of guilt, acquit Horsman of being a felon in possession of a firearm. In his first trial, Horsman was presented as a sympathetic figure who suffered through years of childhood abuse, <u>see</u> Trial Tr. at 186-87, and who possessed the .357 magnum handgun solely to commit suicide. <u>See</u> <u>id.</u> at 309. The prosecution expressed its concern that Horsman was pursuing a strategy of jury nullification. <u>See, e.g.</u>, Trial Tr. at 197 ("And as this Court has seen from the opening statement, it appears that the defendant is going to be trying to appeal to the jury to nullify the evidence that's presented in this case."). We acknowledge that, on retrial, it is at least a possibility that Horsman could achieve jury nullification.

This possibility, however, also does not transform a harmless error into a prejudicial one. While "jurors possess the raw power to set an accused free for any reason or for no reason, their duty is to apply the law as given to them by the court." <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1190 (1st Cir. 1993). "[J]ury nullification, while it is available to a defendant, is only a power that the jury has and not a 'right' belonging to the defendant, much less a substantial right." <u>United States v. Gonzalez</u>, 110 F.3d 936, 947-48 (2d Cir. 1997). Accordingly, where "[t]he only possible deprivation suffered by [the defendant is] the possibility of jury nullification," <u>id.</u> at 947, the defendant's substantial rights have not been violated.

We conclude that the district court's error in permitting the government to present evidence of Horsman's prior conviction was harmless. Accordingly, we affirm the district court's judgment.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.